In the Matter of TOWN OF WATERFORD et al., Petitioners, against WATER POLLUTION CONTROL BOARD, Respondent.

Third Department, July 23, 1957.

*George E. O'Connor* and *James A. O'Connor (John T. DeGraff* and *John A. Murray* of counsel), for petitioners.

*Louis J. Lefkowitz, Attorney-General (James O. Moore, Jr.,* and *George H. Rothlauf* of counsel), for respondent.

GIBSON, J. The determination from which petitioners appeal assigned the classification '' C '' to the waters within the section of the Mohawk River extending from its mouth to the first dam above Cohoes Falls.

Pursuant to sections 1208 and 1209 of the Public Health Law, the board had previously adopted standards of quality and purity to be later applied in classifying the surface waters of the State in seven classes. The standards were fixed according to detailed technical specifications and were also defined in terms of best usages, those for class '' C '' being: '' Fishing and any other usages except for bathing or as source of water supply for drinking, culinary or food processing purposes.'' It is undisputed that a result of the assignment of the classification '' C '' to the waters on which the Town and the Village of Waterford border will be to require those municipalities, the petitioners here, to construct sewage treatment facilities. Petitioners contest the classification, primarily on the ground that, in imposing it, the board failed to comply with the standards prescribed by section 1209 and failed to give any consideration to the fiscal and economic aspects of its classification. In essence, however, the basic controversy is as to the right of the board to assign the classification without regard to the impact of a necessarily increased tax burden upon the municipalities concerned. It is argued that the large cost of sewage disposal facilities will prevent expenditures for other public purposes and improvements deemed equally or more necessary and as greatly in the public interest and we are asked to envisage a dark future in which sewage disposal plants built at great cost in these small communities will stand idle, upon the exodus of a tax-ridden population. Great as the appeal of these arguments may be, we have concluded that their validity and potency were for the Legislature and that the considerations now urged upon us are in the past. The language of the statute, read in the light of its history, impels us to this view.

The Water Pollution Control Act, now article 12 of the Public Health Law, was enacted as chapter 666 of the Laws of 1949, following studies and reports of the Special Committee on Pollution Abatement of the Joint Legislative Committee on Interstate Cooperation. (See N. Y. Legis. Docs., 1947, No. 59; 1948, No. 50; 1949, No. 51.) Each of the reports recognized the difficult fiscal problems to which control and abatement would give rise. The 1948 report (p. 59), for example, after commenting on the tendency to delay action until the pollution problem should assume large proportions, said that, '' by that time, the means of correction are intricate and costly and may represent

a major financial undertaking for any community or industry." This report (p. 61) recommended further studies of "the many fiscal and financial problems involved in pollution control" and consideration of constitutional amendments and legislative measures to "ease" the existing limitations on municipal borrowing. In this connection, favorable comment was made as to the concurrent resolution to amend article VIII of the New York Constitution (as was subsequently accomplished [1951]) to permit the proportionate exclusions from constitutional debt limitations of municipal borrowings for projects wholly or in part self-liquidating.

The special committee submitted with its 1949 report (*supra*) the proposed act, which was adopted in that year. This same report (p. 65) again stressed the magnitude of the fiscal and financial problems with which municipalities would be confronted and which, the committee said, "will have a direct bearing on the effectiveness of any law in correcting stream pollution conditions." Tables of costs were embodied in the report and the problems of financing were repeatedly recognized and emphasized. Recommending further studies of the fiscal problems by the special committee and the Department of Audit and Control, the report (p. 66) concluded: "This subject is of such vital importance to the success of the state's water pollution control aims that the Special Committee strongly recommends that an intensive study of municipal fiscal problems be carried out with a view to expediting the construction of needed municipal sewage works projects."

Accordingly, the life of the special committee was twice again extended and reports were made in 1950 and in 1951. (N. Y. Legis. Docs. 1950, No. 53; 1951, No. 69.) As these reports followed the adoption of the Water Pollution Control Act, they do not aid the search for the legislative intent which prompted its enactment. It may be noted, however, that the 1951 report recommended legislation, which was enacted that year, to continue State aid for sewage works planning by repealing former section 35 of the Public Works Law, and to modify the laws relating to sewer rents (General Municipal Law, art. 14-F; General City Law, § 20, subds. 26, 26-a; Village Law, § 279; Town Law, § 198), this in anticipation of the amendment of article VIII of the Constitution, above discussed, and to render such "proposed advance exclusion amendment fully effective" as an aid to municipal financing of sewage disposal facilities.

Thus, when the Legislature enacted the Water Pollution Control Act, the self-evident fact that any comprehensive system of control would involve large cost to the municipalities

concerned was given additional emphasis by the special committee's reports and from them it was apparent that in given cases costs would exceed existing debt limitations unless the necessary projects were to be rendered wholly or partially self-liquidating through the imposition and collection of sewer rents. It must therefore be assumed that the Legislature weighed the same considerations which petitioners subsequently urged upon the board and determined that the public interest nevertheless required abatement of pollution despite the heavy tax burden which would necessarily be incurred. It was equally obvious then, as it is now, that, within particular areas at least, any control undertaken would be ineffective if one community might nullify the measures undertaken by its neighbors to accomplish abatement.

The memorandum accompanying Governor Dewey's approval of the act stated, in part: " This bill if enacted into law, will set in motion technical studies of the condition of our watercourses and of their best and most practical uses, which will be translated into a system of water quality standards and stream classifications. These classifications will provide a pattern to which all wastes-producers will be required to adhere, by means of treatment facilities for their liquid wastes." (Public Papers of Gov. Thomas E. Dewey, 1949, p. 333.)

Section 1200 of the act (Public Health Law, art. 12) states the public policy thus: " It is declared to be the public policy of the state of New York to maintain reasonable standards of purity of the waters of the state consistent with public health and public enjoyment thereof, the propagation and protection of fish and wild life, including birds, mammals and other terrestrial and aquatic life, and the industrial development of the state, and to that end require the use of all known available and reasonable methods to prevent and control the pollution of the waters of the state of New York." Section 1201 provides: " It is the purpose of this article to safeguard the waters of the state from pollution by: (a) preventing any new pollution and (b) abating pollution existing when this chapter is enacted, under a program consistent with the declaration of policy above stated in the provisions of this article."

Jurisdiction is conferred upon the board by section 1208 " to abate and prevent the pollution of the waters of the state." and " to adopt classifications of waters and the standards of quality and purity thereof ". Section 1209 provides, in part, that " Such classification shall be made in accordance with considerations of best usage in the interest of the public and with regard to the considerations mentioned in subdivision three

hereof." Subdivision 3 so referred to requires that in adopting the classification of waters and the standards of purity and quality, " consideration shall be given " to, among other things, " (b) the character of the district bordering said waters and its peculiar suitability for the particular uses, and with a view to conserving the value of the same and encouraging the most appropriate use of lands bordering said waters, for residential, agricultural, industrial or recreational purposes." Petitioners contend that the classification challenged was not " in the interest of the public " and was made without regard to the considerations described in paragraph (b), above quoted.

As has been noted, however, these contentions resolve into the basic thesis that the increased tax burden which enforcement of the assigned classification would impose will contravene the public interest, as constituting an economic hardship and as rendering impossible or not feasible expenditures for other public improvements. That is the substance of the pertinent allegations of the petition and of the protest made in advance of the classification and alleged in the petition to have been improperly ignored.

Thus petitioners' protest, as they denominate their attorney's letter of March 10, 1953 to the board, after referring to the hearing to be held that day, stated petitioners' " protest against the classification of the Mohawk River in Class ' C ' on the ground that any treatment of the sewage of said municipalities would cost a prohibitive sum." A request for time " to present engineering facts and data on the subject " [of cost] was made. While it was stated that the proposed classification was considered contrary to the public interest, it seems clear that that conclusion, read in context with the language which preceded and followed it, rested on the basis of the great cost contemplated and the resulting burden of taxation.

Petitioners did not appear at the hearing but their request for time to submit data was granted and subsequently they filed with the board two memoranda, the last on September 21, 1953. In these, petitioners again asserted the proposed classification to be contrary to the public interest but again the ground urged was that of the excessive tax burden the anticipated costs would impose.

The adoption on May 18, 1954 of the classification complained of gave rise to this proceeding. The petition, in paragraph " 25th ", deals with the merits of the classification and alleges: " 25th. Petitioners take the position that it is not in the public interest to impose upon the taxpayers of the Town of Waterford and the Village of Waterford an enormous burden involv-

ing a 150% increase in their taxes and to require the Town of Waterford and the Village of Waterford to borrow money up to its legal debt limit. This would preclude for a generation all other public improvements of any kind in the Town of Waterford and the Village of Waterford, including streets, schools, fire department equipment, highway improvement, water works extension, and any other form of capital expenditure. Petitioners contend that this is not in ' the public interest,' as defined in Section 109, particularly when the benefit to be derived from this complete disorganization of our finances is solely for the purpose of obtaining some minor improvement in fishing in the Mohawk and Hudson rivers. No claim is made that any question of public health is involved, nor that there is any nuisance present. The sewage discharged into the river by the Town of Waterford and the Village of Waterford amounts to only a very small fraction of 1% of the normal flow of the river." It seems clear that the fair intendment of these allegations is to charge that the classification was contrary to the public interest solely because the resulting tax burden would be high and out of all proportion to any benefits which might accrue to the public. Thus, we deem the petition confirmatory of our conclusion that the protest and objections interposed prior to the board's action related solely to the factors of cost and taxation. If these objections were predicated on considerations as to which the Legislature had acted and had determined adversely to what petitioners conceive to be their interest and the public interest generally, it follows that the board properly rejected them.

We have concluded that these problems of municipal financing were not among the considerations contemplated by paragraph (b) of subdivision 3 of section 1209, above quoted, and upon which petitioners must rely. The language of the statute and the legislative history above discussed seem to require that conclusion, which appears to us to be strongly fortified by the provisions of section 1224. By that section it is provided, in part, that " if, after public hearing, the board finds that it is impossible or impracticable for any person to comply with the standards, determinations or orders of the board as to treatment of sewage, industrial waste or other wastes, either because no adequate or practical method of disposal or treatment is known or, because of financial inability (due to statutory restrictions on borrowing power or otherwise) to construct the necessary treatment works or provide other adequate means of disposal, the board shall not order the abatement or cause suit or action to be brought to prevent or abate the discharge of

such sewage, industrial waste or other wastes by such person during such period of time, not in excess of five years, as the board determines necessary in order to provide means for disposal or treatment of such sewage, industrial waste or other wastes, so as to comply with such recommendations or such requirements. Extensions of time beyond the five-year or shorter period may be granted by the board after public hearing, if the person involved shows to the satisfaction of the board that he has diligently tried to comply with the orders of the board.''

The statute seems clearly to recognize the fiscal problems involved, which were emphasized in the studies which preceded it, and it is equally apparent that the Legislature was confronted with a conflict between the factor of cost and the concept of public policy which it determined to enunciate. The result was the all-inclusive declaration of policy which, in our view, was intended to and did override the manifest and potent objections on fiscal grounds, subject to the compromise, if only by way of justifiable delay, which section 1224 represents.

From our conclusion that petitioners' expressed objections to the proposed classification were on grounds which the Legislature had removed from the board's consideration, it necessarily follows that the board properly rejected them.

Petitioners' second line of attack is upon procedural grounds. They contend that the statutory provision for a public hearing (Public Health Law, § 1209, subd. 6) contemplated that witnesses be sworn, testimony taken, opportunity for cross-examination given and findings of fact made, and that the hearing held by the board was deficient as respected each of these supposed requirements. The board would justify its procedure on the theory that it acted in a quasi-legislative capacity and was not required to produce or receive evidence, to permit cross-examination or to make findings of fact.

Subdivision 6 of section 1209 of the Public Health Law provides that '' The adoption, alteration or modification of a classification of the waters of the state or the standards of quality and purity, above prescribed, shall be made by the board only after public hearing on due notice.'' Nothing further is provided as to the form and conduct of the hearing and the board contrasts this provision with the specific requirements as to proof, compelling the attendance of witnesses and the making of findings provided by paragraph (b) of subdivision 3 of section 1208, as to hearings held '' with respect to the violations of the provisions of this article or the orders issued by the board ''. The board would thus distinguish the types of hear-

ings which it terms·" quasi-legislative " and " quasi-judicial ".

We do not find helpful to the exploration of this broad field an attempt thus to categorize administrative functions on the theory that certain procedural requirements are to be deemed inevitable in one case and necessarily excluded in the other. There is no clear line of demarcation between quasi-judicial and quasi-legislative procedures. " Some procedures may, indeed, be both. * * * There are, it is true, some criteria for differentiation. There is a distinction between action general in its ·application and action directed to a particular individual. Such differences may play an important part in determining what administrative procedure, or what kind of judicial review, is appropriate in a particular field." (Benjamin on Administrative Adjudication in the State of New York [Report to Governor Lehman, 1942], p. 6.) Here, the board's classification of the waters of the Mohawk River was " action general in its application " to a wide area and to the aggregate of many communities, individuals and industries, none of whom, other than petitioners, interposed objection, but the action was, at the same time, of specific impact upon each municipality and other entity affected. Therein may lie a distinction warranting the application of different procedural processes.

The public hearing was conducted upon notice published in newspapers and mailed to the chief executive of each municipal corporation affected. (Public Health Law, § 1209, subd. 7.) At the hearing, the classifications proposed were explained by the board and questions and unsworn statements and expressions of opinion were received from those in attendance. Some months later, the classifications were promulgated. In our view, the procedure followed was proper and sufficient under the circumstances disclosed by this record.

A different situation might well have been presented had these petitioners, or any objector, demanded an adjudication of an issue germane to the classification as it would affect a particular area or interest. Thus, for example, it might be proper to inquire into the consideration given by the board to " the character of the district bordering said waters and its peculiar suitability for the particular uses * * * with a view to conserving the value of the same and encouraging the most appropriate ·use of lands bordering said waters, for residential, agricultural, industrial or recreational purposes ". (Public Health Law, § 1209, subd. 3, par. [b].)

We do not determine the procedural question which might thus be posed, as it·is not·now squarely presented to us. In this case, petitioners failed, upon an appearance at the public

hearing or otherwise, to make any objection or demand upon which a factual issue of a justiciable nature might arise. Instead, they requested and obtained extensions of time to file memoranda which, while factual in content, raised only what we have held to be a question of law. At no time did they seek to produce witnesses or to test by cross-examination the evidence or reports upon which the proposed classification was predicated. Instead, petitioners chose to submit the question by memoranda and did not complain of any supposed infirmity in the public hearing or request an additional hearing until after an unfavorable determination had been made. Thus, petitioners may not now be heard to voice objections to supposed errors of procedure which, in any event, were not material as respected the determination of the particular question submitted. Even now, on this appeal, no issue has been suggested which would have warranted a hearing of an adjudicative nature.

The determination should be confirmed, without costs.

FOSTER, P. J., BERGAN, COON and HALPERN, JJ., concur.

Determination confirmed, without costs.